## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| JAMILA ARMSTRONG, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SNOWFLAKE INC., <br><br> Defendant. | Case No.: _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Jamila Armstrong ("Plaintiff"), by and through her undersigned counsel, files this Class Action Complaint individually and on behalf a class of all similarly situated persons against Defendant Snowflake Inc. ("Snowflake" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and her own personal knowledge.

### NATURE OF THE ACTION

1.      Plaintiff brings this action against Snowflake for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information in its possession and/or control, including, but not limited to, individuals, names, addresses, email addresses, dates of birth, credit card information, bank account information, Social Security Numbers, driver's license numbers, and other

1

government identification numbers (collectively, "PII"); and for its failure to comply with industry standards to protect information systems that contain PII.

2.    Snowflake is a cloud computing-based data cloud company that provides cloud-based data storage and analytics services, generally termed "data-as-a-service" to numerous corporate customers, including Ticketmaster, LLC, of which Plaintiff was a customer.

3.    Snowflake bills its services as "[a] single, fully managed platform that powers the AI Data Cloud. Snowflake securely connects businesses globally across any type or scale of data to productize AI, applications and more in the enterprise."[1]

4.    In Defendant's regular course of providing its data cloud platform, Snowflake is entrusted with its customers' sensitive information, including the PII of Plaintiff and Class Members. This PII includes, but is not limited to, name, email address, physical address, payment information such as card numbers, expiration dates, and security codes, and usernames and passwords.

5.    Snowflake recognizes the responsibility of protecting the sensitive information it is entrusted, stating that "[s]ecurity has been foundational to the

---

[1]  *The Snowflake Platform*, SNOWFLAKE, https://www.snowflake.com/en/data-cloud/platform/ (last visited July 17, 2024).

snowflake platform since the very beginning" and further representing that "[s]ince our founding in 2012, security of our customers' data has been our highest priority."[2]

6.    Despite Snowflake's purported commitment to comprehensive data security, Defendant's data security obligations fell flat. On or about May 23, 2024, Snowflake discovered that unauthorized third parties had gained access to certain of its customers' cloud accounts. By accessing these accounts, cybercriminals were able to steal and advertise for sale data from a significant volume of Snowflake's corporate customers, including Ticketmaster, Santander, LendingTree, Nieman Marcus, and Advance Auto Parts, among numerous others (the "Data Breach" or "Breach"). Technology industry professionals have deemed this one of the largest— if not *the* largest—data breaches in history.[3]

---

[2]    Brad    Jones,    *Snowflake    Security    Hub*,    SNOWFLAKE, https://www.snowflake.com/en/resources/learn/snowflake-security-hub/    (last visited July 16, 2024).
[3] Eric Ezenwa, *Cybersecurity wake-up call: Lessons from Snowflake's massive data breach*,    INTERESTING    ENGINEERING    (July    8,    2024), https://interestingengineering.com/culture/snowflake-billion-dollar-data-breach-cybersecurity; Matt Burgess, *The Snowflake Attack May Be Turning Into One of the Largest    Data    Breaches    Ever*,    WIRED    (June    6,    2024), https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree/.

7.     Security researchers have attributed the Data Breach to the cybercriminal gang, UNC5537, and to date have notified approximately 165 Snowflake customers that their data may have been stolen during the Data Breach.[4]

8.     A "critical factor" leading to the Data Breach was Snowflake's data security policy, or lack thereof, on multifactor authentication ("MFA"). At the time of the Data Breach, Snowflake did not at automatically enroll its customers with or require them to set up MFA to access their Snowflake accounts.[5] On July 9, 2024, over two and a half months following its discovery of the Data Breach, Snowflake announced that it has given administrators of its accounts the capability to require MFA for all account users.[6]

9.     As a direct and proximate result of Snowflake's failure to implement and follow basic security procedures, Plaintiff's and Class members' PII is now in the hands of cybercriminals and available for sale on the dark web.

10.     Plaintiff and Class members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives.

---

[4] Zack Whittaker, *Mandiant says hackers stole a 'significant volume of data' from Snowflake customers*, TECHCRUNCH (June 10, 2024), https://techcrunch.com/2024/06/10/mandiant-hackers-snowflake-stole-significant-volume-data-customers/
[5] *Id.*
[6] Brad Jones and Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Blog, RESOURCES (July 9, 2024), https://www.snowflake.com/blog/snowflake-admins-enforce-mandatory-mfa.

Consequently, Plaintiff and Class members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

11.    As such, on behalf of herself and all others similarly situated, Plaintiff brings claims for negligence, negligence per se, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief.

## PARTIES

12.    Plaintiff Jamila Armstrong is an adult who at all relevant times is a resident and citizen of the state of South Carolina. Plaintiff is a customer of Ticketmaster, one of Snowflake customers impacted by the Data Breach.

13.    Defendant Snowflake Inc. is a Montana corporation with its principal place of business at 106 E. Babcock Street, Suite 3A, Bozeman, Montana 59715. As such, Defendant is a citizen of the state of Montana.

14.    Plaintiff requests leave to amend this complaint should additional defendants or causes of action become known.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

16.     This Court has personal jurisdiction over Defendant because Snowflake is a citizen of the state of Montana.

17.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business within this District.

## FACTUAL BACKGROUND

**A.     Snowflake Is Responsible for the Security of Its Corporate Customers' Highly Sensitive Data.**

18.     Snowflake is a cloud computing-based data company. Snowflake's cloud computing platform allows its customers to store, process, and analyze data in a single place.

19.     Snowflake provides its data cloud platform to thousands of national and international entities such as private for-profit corporations, non-profits, universities, and government agencies.[7]

20.     Defendant is one of the largest data cloud platform providers on the market, claiming "thousands of organizations around the world" as its customers. Since its incorporation, Snowflake has acquired more than a dozen companies to

---

[7] *See generally Mobilizing the World's Data, Apps and AI*, SNOWFLAKE, https://www.snowflake.com/en/why-snowflake/ (last visited July 17, 2024); *see also Leaders Choose Snowflake*, SNOWFLAKE, https://www.snowflake.com/en/customers/ (last visited July 17, 2024).

bolster its service offerings and has opened over 45 corporate offices around the globe.[8]

21.    During the regular course of providing its data cloud platform to its customers, Snowflake is provided and entrusted with Plaintiff's and Class members' PII. As Defendant itself has stated, "Snowflake manages all aspects of how this data is stored—the organization, file size, structure, compression, metadata, statistics, and other aspects of data storage are handled by Snowflake."[9]

22.    As a major provider of cloud computing services, Snowflake advertises that it "sets the standard for data security" and further represents that its cloud computing platform "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data." Snowflake also states that its "security architecture is completed by the monitoring, alerts, controls, and processes that are part of Snowflake's comprehensive security framework."[10]

23.    Snowflake recognizes also the importance of maintaining adequate data security for its cloud computing platform users: "In today's connected world where

---

[8] *Fast Facts*, SNOWFLAKE (April 30, 2024), https://www.snowflake.com/wp-content/uploads/2021/05/SnowflakeFastFactsSheet.pdf.

[9] *Key Concepts & Architecture*, SNOWFLAKE, https://docs.snowflake.com/en/user-guide/intro-key-concepts (last visited July 17, 2024).

[10] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security/ (last visited July 17, 2024).

cybercriminals have greater opportunity than ever before, data security is crucial for every business." Snowflake goes on to recommend a list of data security solutions that companies can implement; a list that includes Identity and Access Management ("IAM") strategies. [11]

24.     IAM systems apply individualized access controls through, *inter alia*, authentication such as MFA.[12] MFA is an electronic authentication method "that requires more than one distinct authentication factor" for a user to be granted access to a website or application.[13] Examples of MFA include the combination of both an account password and a single-use password sent via text message to a user's mobile phone in order to access an account.

25.     MFA has become an "increasingly important" piece of IAM strategies as standard one-factor authentication, which relies on only usernames and passwords," is easy to break. Indeed, compromised login credentials are a leading cause of data breaches and MFA adds an extra layer of protection. So "[e]ven if hackers steal a password, it won't be enough to gain unauthorized access to a system."[14]

---

[11] *Id.*
[12] Matthew Kosinski and Amber Forrest, *What is IAM?*, IBM (Jan. 22, 2024), https://www.ibm.com/topics/identity-access-management.
[13] Matthew Kosinski and Amber Forrest, *What is MFA?*, IBM (Jan. 4, 2024), https://www.ibm.com/topics/multi-factor-authentication.
[14] *Id.*

26.     Even though Snowflake supports MFA to provide increased security for its customers accessing the Snowflake platform and recommends that its customers implement MFA, Defendant did not require its customers to use MFA or automatically enroll its customers into MFA prior to the Data Breach.[15]

27.     Despite representing its cloud computing platform as a solution to the problem of data security, however, Snowflake's representations fell flat, leading to the Data Breach and compromise of Plaintiff's and Class members' PII.

**B.     The Snowflake Data Breach.**

28.     On or about May 23, 2024, Snowflake became aware of unauthorized access to certain customer accounts and commenced an investigation into the unauthorized access.[16]

29.     To aid in Defendant's investigation into the cause of the Data Breach, Snowflake engaged third-party cybersecurity firm, Mandiant, who subsequently uncovered "a threat campaign targeting Snowflake customer databases [ ] with the intent of data theft and extortion."[17]

---

[15] *Multi-factor authentication (MFA)*, SNOWFLAKE, https://docs.snowflake.com/user-guide/security-mfa (last visited July 17, 2024).

[16] Brad Jones, *Detecting and Preventing Unauthorized User Access*, SNOWFLAKE (originally published May 30, 2024; last updated June 10, 2024), https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-user-access/8967.

[17] Mandiant, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, GOOGLE CLOUD: BLOG (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion.

30.    According to Mandiant, the threat actor, UNC5537, was able to gain access to Snowflake customer accounts via stolen customer credentials, enabling the threat actor to gain access to the affected customer accounts and the "export of a significant volume of customer data."[18]

31.    Following the threat actor's exfiltration of data from Snowflake customer accounts, the threat actor began advertising the stolen data for sale on the dark web. For instance, on or about May 30, 2024, the threat actor began advertising the personal and financial information of 560 million individuals stolen from Ticketmaster's Snowflake account for $500,000.[19]

32.    Similarly, on or about May 31, 2024, the threat actors began selling information stolen from Santander Bank's Snowflake account. The stolen information included the personal information of 30 million customers and employees, 28 million credit card numbers, and 6 million account numbers and balances and was being advertised for sale for $2 million on the dark web.[20]

---

[18] *Id.*

[19] Sergiu Gatlan*, Data of 560 million Ticketmaster customers for sale after alleged breach*, BLEEPING COMPUTER (May 30, 2024), https://www.bleepingcomputer.com/ news/security/data-of-560-million-ticketmaster-customers-for-sale-after-alleged- breach/.

[20] Lawrence Abrams, *ShinyHunters claims Santander breach, selling data for 30M customers*, BLEEPING        COMPUTER        (May        31,        2024), https://www.bleepingcomputer.com/news/security/shinyhunters-claims-santander- breach-selling-data-for-30m-customers/.

33.     Days later, on or about June 5, 2024, threat actors began selling three terabytes of data relating to Advanced Auto Parts on the dark web. The information was stolen from Advanced Auto Parts' Snowflake account and offered for sale for $1.5 million dollars.

34.     To date, Mandiant and Snowflake have confirmed that threat actors stole information from approximately 165 Snowflake customer accounts.[21] And while the stolen data varies from customer account to customer account, the stolen data includes a wide variety of PII, including but not limited to: names, addresses, email addresses, dates of birth, credit card information, bank account information, Social Security Numbers, driver's license numbers, and other government identification numbers.

35.     Mandiant has also determined that the Data Breach is the result of the threat actors using credentials previously stolen via infostealer malware to compromise Snowflake customer accounts that did not have MFA enabled.[22]

36.     And Snowflake itself has recommended that its customers immediately take the following steps in light of the Data Breach: (1) enable multifactor authentication; (2) reset and rotate all Snowflake account credentials; and (3) set up

---

[21] *Supra* note 17.
[22] *Id.*

network rules that only allow authorized users or traffic from trusted locations to access Snowflake accounts.

37. The Data Breach has compromised the PII of millions of people, and the extent of the damage is still coming to light as more and more companies begin notifying individuals of the Data Breach.

**C.    The Value of PII and Effects of Unauthorized Disclosure.**

38. Snowflake, one of the largest data cloud service providers in the world, certainly knew the value of the data it stored, the data's sensitive nature, and the disastrous consequences for its corporate customers and individual consumers should this data be compromised.

39. As evidenced by its promises of security to its customers, Snowflake also knew that a breach of its platform, and exposure of the personal data it contains, would result in the increased risk of identity theft and fraud for the individuals whose PII was compromised.

40. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at third-party service providers, including Progress Software Corporation, Fortra, and Accellion.

41. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation

of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[23]

42.    Hackers and cybercriminals often trade stolen PII on the cyber black market for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. Here, the hackers responsible for the Data Breach have already advertised some of the stolen information for sale on the dark web.

43.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities. In 2023, there were 3,205 publicly disclosed data compromises, affecting over 353 million victims. The U.S. specifically saw a 72% increase in data breaches from the previous all-time high in 2021 and a 78% increase over 2022.[24]

44.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased in recent years. For instance, in 2019, roughly 3.5

---

[23] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[24] *2023 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

million people reported some form of identity theft, fraud, or other consumer complaint compared to 5.4 million people in 2023.[25]

45.    Cloud storage databases are prime targets for cybercriminals. It is estimated that more than 60% of the world's corporate data is stored in the cloud, making the cloud a highly attractive target for cybercriminals.[26]

46.    Indeed, "[i]n 2023, over 80% of data breaches involved data stored in the cloud. That is not just because the cloud is an attractive target. In many cases, it is also an easy target due to cloud misconfiguration – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups."[27]

47.    According to the National Security Agency, "'cloud misconfigurations are the most prevalent cloud vulnerability' and can be exploited by hackers to access cloud data and services."[28]

48.    The consequences of Snowflake's failure to keep Plaintiff's and Class members' PII secure are long-lasting and severe. Indeed, the breadth of the data compromised in the Data Breach makes the information particularly valuable to

---

[25] *Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE,    https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Key%20Facts (last visited July 17, 2024).
[26] Stuart Madnick, *Why Data Breaches Spiked in 2023*, HARVARD BUSINESS REVIEW (Feb. 19, 2024), https://hbr.org/2024/02/why-data-breaches-spiked-in-2023.
[27] *Id.*
[28] *Id.*

cyber criminals and leaves Plaintiff and Class members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

49.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

50.    The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new

number, the absence of any credit history under the new number may make more difficult for you to get credit.[29]

51.     Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

52.     **Payment Card Information**—Cybercriminals can use stolen payment card information to create counterfeit payment cards and make unauthorized charges or withdrawals that can cause consumers to incur significant financial losses. Indeed, the counterfeit payment cards (or the compromised payment card information itself) can be used to purchase high-ticket goods or gift cards that can then be sold for cash all while charging the consumer's original card. Cybercriminals can also sell the stolen payment card information to other cybercriminals on the dark web. In turn, when a payment card is fraudulently used, it can damage the cardholder's credit score, making it difficult to obtain new credit in the future.

53.     **Driver's License Numbers**—These are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and

---

[29] Soc. Sec. Admin., *Identify Theft and Your Social Security Numbers* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

54.    For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

55.    Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

56.    **Financial    Account    Information**—Stolen    financial    account information can have an equally devasting impact on individuals. Cybercriminals can deplete and wipe out a person's life savings or take out a loan or mortgage against someone's home with the click of a button. Indeed, stolen financial account information can be used to transfer money from a victim's bank account to another;

to make purchases on online shopping sites; file fake tax returns; and create and use fraudulent checks.[30]

57.    A data breach creates an imminent danger of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a 2021 research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[31]

58.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data

---

[30] Anthony Aguilar, *What Can Scammers Do With Your Bank Account Number*, AURA (Oct. 5, 2022), https://www.aura.com/learn/what-can-someone-do-with-your-bank-account-number.

[31] Erika Harrell, *Victims of Identity Theft, 2018*, Bureau of Just. Stat., U.S. DEP'T OF JUST., NCJ 256085 (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

59.    The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

60.    Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[32] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[33]

61.    A 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and

---

[32] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[33] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[34]

62.    As a technology company that deals exclusively in data storage and processing, Snowflake was uniquely positioned to ensure the safety of the PII stored on its platform. Snowflake explicitly warranted that it would protect its customers' data through multiple layers of cybersecurity measures, including network security, IAM, and data encryption.[35]

63.    Snowflake also knew or should have known the importance of safeguarding the PII stored on its platform and of the foreseeable consequences if its data security systems were breached. Snowflake failed, however, to take adequate cybersecurity measures to prevent the Data Breach exfiltration of Plaintiff's and Class members' PII from occurring.

**D.    Snowflake Failed to Comply with FTC Guidelines and Industry Best Practices.**

64.    Snowflake is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in

---

[34] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

[35] *Supra* note 11.

or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

65.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[36]

66.    The FTC recommends that third-party service providers implement reasonable security measures.[37]

67.    The FTC recommends that businesses:

    a.    identify all connections to the computers where sensitive information is stored;

    b.    assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

    c.    do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

    d.    scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other

---

[36] U.S. Fed. Trade Comm'n, *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 17, 2024).

[37] *Supra* note 31.

potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.     pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.     use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.     determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.     monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.     monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

68.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ

reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

69.    Upon information and belief, Snowflake failed to properly implement one or more of the basic data security practices described above. Snowflake's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class members' PII by threat actors.

70.    Snowflake's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

71.    Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[38]

72.    The NIST's publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk

---

[38] *See* Nat'l Institute of Standards and Tech., *Framework for Improving Critical Infrastructure Cybersecurity*, at 24–44 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[39] Upon information and belief, Snowflake failed to adhere to the NIST guidance.

73.     Further, Snowflake itself recommends that companies implement the following data security measures, including:

  a.     implementing data governance tools that "provide visibility into what data exists, where it is, and who accessed it;"

  b.     masking sensitive information to ensure that is properly protected;

  c.     encrypting data to convert text into an unreadable format without the decryption key;

  d.     employing endpoint protection to identify breaches as the occur and "lock down the affected endpoints;"

  e.     employing IAMs to manage users' digital identities and control user access to data;

  f.     engaging in regular data security audits to identity vulnerabilities; and

---

[39] *Id.* at 26–43.

    g.    implementing data governance polices "that govern[] how data is made available, used, and secured."[40]

74.    Upon information and belief, Snowflake's failure to protect Plaintiff's and Class members' PII is a result of Defendant's failure to adopt reasonable safeguards required by the FTC, NIST, and industry best practices, including Defendant's deliberate choice to not enroll all customers in MFA despite strongly recommending the use of MFA when accessing Snowflake accounts.

75.    Snowflake was, at all times, fully aware of its obligations to protect the PII of Plaintiff and Class members because of its business model of collecting and storing PII. Snowflake was also aware of the significant repercussions that would result from its failure to do so.

**E.    Plaintiff and Class Members Suffered Damages.**

76.    The ramifications of Snowflake's failure to keep user PII secure are long lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even

---

[40] *Supra* note 10.

more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

77.    In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[41] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class members) must take after a data breach, like Defendant, are both time-consuming and of only limited and short-term effectiveness.

78.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges

---

[41] U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-230, DATA BREACHES: RANGE OF CONSUMER RISKS HIGHLIGHTS LIMITATION OF IDENTITY THEFT SERVICES (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.

from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

79.    Consumer fraud and identity theft are only increasing. Recently published FTC data show that consumers reported losing more than $10 billion to fraud in 2023, representing a 14% increase over reported losses in 2022. In 2023, there were more than 1 million reports of identity theft received through the FTC's IdentityTheft.gov website.[43]

80.    Besides the monetary damage sustained, consumers may also spend anywhere from one day to more than six months resolving identity theft issues.[44]

81.    Ultimately, the time that victims spend monitoring and resolving identity theft issues takes an emotional toll. In 2021, the Department of Justice found that approximately 80% of victims of identity theft experienced some type of emotional distress, and more than one-third of victims experienced moderate or severe emotional distress.[45]

---

[42] *See* U.S. Fed. Trade Comm'n, *Identity Theft Victim Checklist*, https://www.identitytheft.gov/Steps (last visited July 17, 2024).

[43] *As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, U.S. Fed. Trade Comm'n: Press Releases (Feb. 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.

[44] *Supra* note 31.

[45] *Id.*

82.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

83.     As a result of Snowflake's failure to prevent the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their highly valuable PII; the imminent and certainly impending injury flowing from fraud and identity theft posed by their PII being placed in the hands of criminals; damages to and diminution in value of their PII that was entrusted to Defendant with the understanding the Defendant would safeguard the PII against disclosure; and continued risk to Plaintiff's and Class members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII with which it was entrusted.

## F.     Plaintiff's Experience.

84.     Plaintiff is a Ticketmaster customer and was required to entrust Ticketmaster with her PII in order to buy and sell tickets on Ticketmaster's platform. Upon information and belief, the PII Plaintiff entrusted to Ticketmaster was in turn

entrusted to Snowflake, stored in Ticketmaster's Snowflake account, and compromised in the Data Breach.

85.     On or about July 2, 2024, Plaintiff received a data breach notification from Ticketmaster via email, informing her that her PII had be compromised in the Data Breach.

86.     Following the Data Breach, Plaintiff's credit monitoring services, Credit Karma, alerted her that her PII provided to Ticketmaster had been compromised in in the Data Breach. Plaintiff also received a dark web notification from her credit monitoring services, alerting her that her PII had been discovered on the dark web.

87.     Since the Data Breach, Plaintiff has been required to spend her valuable time and effort taking steps to mitigate the risk of misuse of her PII. Specifically, Plaintiff has been required to spend her valuable time and effort monitoring her financial accounts for suspicious activity. Plaintiff would not have had to engage in these time intensive efforts but for the Data Breach.

88.     Plaintiff has suffered actual injury from having her PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of her PII; (b) damages to and diminution of the value of her PII, a form of intangible property that loses value when it falls into the hands of criminals who are

using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

89.    Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

90.    In addition, knowing that hackers accessed and likely exfiltrated her PII and that this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## CLASS ALLEGATIONS

91.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Snowflake Data Breach that occurred between April 2024 and May 2024.

92.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

93.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

94.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach. Based upon public filings, the number of people impacted by the Data Breach is in the millions.

95.    **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class members. Such common questions include, but are not limited to:

      a.    whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class members;

      b.    whether Defendant was negligent in collecting and storing Plaintiff's and Class members' PII;

      c.    whether Defendant had duties not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

      d.    whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class members' PII;

e.  whether Defendant failed to adequately safeguard the PII of Plaintiff and Class members;

f.  whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class members' PII;

g.  whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  whether Plaintiff and Class members are entitled to damages as a result of Defendant's wrongful conduct; and

i.  whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

96.  **Typicality.** Plaintiff's claims are typical of the claims of the Class members. The claims of Plaintiff and Class members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class members directly and/or indirectly entrusted Defendant with their PII, and it was subsequently released to an unauthorized third party.

97.  **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and

experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

98.    **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

99.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty

and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

100. **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

101. Plaintiff restates and realleges all proceeding allegations as if fully set forth herein.

102. Snowflake owed a duty under common law to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

103. Specifically, this duty included, *inter alia*: (a) designing, maintaining, and testing Snowflake's security systems to ensure that Plaintiff's and Class members' PII in Snowflake's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

104.    Snowflake's duty to use reasonable care arose from several sources, including but not limited to those described below.

105.    Snowflake had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By storing and processing valuable PII that is routinely targeted by cybercriminals, Snowflake was obligated to act with reasonable care to protect against these foreseeable threats.

106.    Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Snowflake's conduct included its failure to adequately restrict access to its computer networks, servers, and/or cloud computing accounts that held individuals' PII.

107.    Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach that target third-party service providers.

108.    Snowflake breached the duties owed to Plaintiff and Class members and thus was negligent. Snowflake breached these duties by, among other things,: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer

information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

109.  But for Snowflake's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised.

110.  As a direct and proximate result of Snowflake's negligence, Plaintiff and Class members have suffered injuries including:

    a.    theft of their PII;

    b.    unauthorized charges to their bank accounts;

    c.    costs associated with canceling and ordering new payment cards;

    d.    time spent reporting fraudulent activity;

    e.    costs associated with requesting credit freezes;

f.   costs associated with the detection and prevention of identity theft;

g.   costs associated with purchasing credit monitoring and identity theft protection services;

h.   lowered credit scores resulting from credit inquiries following fraudulent activities;

i.   costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

j.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

l.   damages to and diminution in value of their PII entrusted to Snowflake with the mutual understanding that Snowflake would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others; and

m.   continued risk of exposure to hackers and thieves of their PII, which remains in Snowflake's possession and is subject to further breaches so long as Snowflake fails to undertake

appropriate and adequate measures to protect Plaintiff and Class members.

111.   As a direct and proximate result of Snowflake's negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

112.   Plaintiff restates and realleges all proceeding factual allegations as if fully set forth herein.

113.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Snowflake of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Snowflake's duty.

114.   Snowflake violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Snowflake's conduct was particularly unreasonable given the nature of its business and the amount of PII it obtained and stored. Snowflake was perhaps most aware of the foreseeable consequences of a data breach.

115.    Snowflake's violation of Section 5 of the FTC Act constitutes negligence per se.

116.    Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

117.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class members.

118.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries, including those identified in paragraph 110 above.

119.    As a direct and proximate result of Snowflake's negligence, Plaintiff and Class members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

120.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

121.   Plaintiff and Class members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Snowflake and that was ultimately accessed or compromised in the Data Breach.

122.   Plaintiffs and Class members conferred a monetary benefit upon Snowflake in the form of monies paid to Snowflake customers for services. Snowflake's business model would not exist save for the need to ensure the security of Plaintiff's and Class members' PII in order to provide cloud computing services to its customers.

123.   The relationship between Snowflake and Plaintiff and Class members is not attenuated, as Plaintiff and Class members had a reasonable expectation that the security of their PII would be maintained when they provided their information to Snowflake's customers.

124.   By engaging in the conduct described in this Complaint, Snowflake has knowingly obtained and derived benefits from Plaintiff and Class members at Plaintiff's and Class members' expense, namely the profits gained in exchange for the use of Snowflake's services, such that it would be inequitable and unjust for Defendant to retain them.

125.   By engaging in the acts and failures to act described in this Complaint, Snowflake has been knowingly enriched by the financial gain. This profit should have been reasonably expended to protect the PII of Plaintiff and the Class.

Defendant knew or should that known that theft of consumer PII was a constant threat, yet it failed to take reasonable steps to ensure the level of security required to have prevent the theft of consumers PII.

126. Snowflake's failure to direct profits derived from Plaintiff's and Class members' patronage of its customers toward safeguarding Plaintiff's and Class members' PII constitutes the inequitable retention of a benefit without payment for its value.

127. Snowflake will be unjustly enriched if it is permitted to retain these benefits following the theft of Plaintiff's and Class members' PII.

128. Snowflake's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class members' PII, while at the same time failing to securely maintain that information from unauthorized access and compromise.

129. Plaintiff and Class members have no adequate remedy at law.

130. As a direct and proximate result of Snowflake's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 108 above.

131.   Snowflake should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

## FOURTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (On Behalf of Plaintiff and the Class)

132.   Plaintiff restates and realleges all proceeding factual allegations as if fully set forth herein.

133.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

134.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Snowflake is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possess Plaintiff's and Class members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class members continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

135.   Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Snowflake owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

b.   Snowflake continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class members' PII.

136.   This Court also should issue corresponding prospective injunctive relief requiring Snowflake to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

137.   If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Snowflake. The risk of another such breach is real, immediate, and substantial. If another breach of Snowflake's platform occurs, Plaintiff and Class members will not have an adequate remedy at law because the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

138.   The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Snowflake if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other

damage. On the other hand, the cost to Snowflake of complying with an injunction by employing reasonable prospective data security measures is relatively minimal. Snowflake has a pre-existing legal obligation to employ such measures.

139.   Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by possibly preventing another data breach at Snowflake, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

140.   WHEREFORE Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

a.    for an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    for an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    for damages in an amount to be determined by the trier of fact;

d.    for an order of restitution and all other forms of equitable monetary relief;

e.   declaratory and injunctive relief as described herein;

f.   awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.   awarding pre- and post-judgment interest on any amounts awarded; and

h.   awarding such other and further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

A jury trial is demanded on all claims so

triable. DATED this 17th day of July 2024

Respectfully Submitted,

*/s/ John Heenan*
John Heenan
John@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091

Gary F. Lynch (*pro hac vice* forthcoming)
Patrick D. Donathen (*pro hac vice* forthcoming)
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
gary@lcllp.com

*Counsel for Plaintiff Jamila Armstrong and the Proposed Class*